## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Kevin LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:22-cv-0532-JCF |
| | ) | |
| Sheriff PATRICK LABAT, in his | ) | |
| official capacity as the Sheriff of | ) | |
| Fulton County, Georgia, FULTON | ) | |
| COUNTY, GEORGIA, Sheriff JOHN | ) | |
| T. WILCHER, in his official capacity | ) | |
| as the Sheriff of Chatham County, | ) | |
| Georgia, and CHATHAM COUNTY, | ) | |
| GEORGIA, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT LABAT'S[1] MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Kevin Lewis ("Mr. Lewis"), and submits this

response in opposition to Defendant Sheriff Labat's motion for summary judgment

as follows:

## I.    The Record Facts

Since 2016, Mr. Lewis has suffered from keratectasia, a degenerative and

---

[1] Having reviewed Defendant Fulton County's arguments, Mr. Lewis abandons his claims against Fulton County.

painful kind of blindness. Doc. 84-4, Plaintiff's Statement of Additional Facts ("PSAF") ¶ 1. Because of his keratectasia, without medication, Mr. Lewis' eyeballs are, *inter alia*, prone to ulceration and extraordinarily susceptible to infection. PSAF ¶ 2. In 2018, Mr. Lewis was declared legally blind, and in 2019, he "reached total corneal blindness." PSAF ¶ 3.

On Saturday, August 1, 2020, following a bizarre series of events, Mr. Lewis was arrested for charges that were dismissed four months later. Doc. 76-1 at 2; PSAF ¶ 4. He was first held at the Chatham County jail, and then, on August 3, Mr. Lewis was transferred to the Fulton County jail (hereinafter, "the Jail"). Doc. 76-1 at 2. Sometime on August 4, he was able to get into the medical unit. *Id.* Still, at first, the doctor "didn't believe" Mr. Lewis about his keratectasia. PSAF ¶ 5. On August 5, the doctor came back, apologized, and finally began to discuss Mr. Lewis' condition with him. PSAF ¶ 6.

### *Mr. Lewis' Detention*

Throughout his time at the Jail, Mr. Lewis requested accommodations for his disability. Defendant never documented any of these requests. Doc. 76-1 at 2 (noting that Defendant has no record of any grievances); PSAF ¶¶ 7-11. [2] From the intake

---

[2] Mr. Lewis' medical records and "Housing Transfer" forms are the only documents Defendant knows of which acknowledge Mr. Lewis' disability, and they do not contain any record of his accommodation requests.

staff, he requested help such as "assisting [him] with step counts," "describing [his] surroundings," "helping [him] read," "helping [him] write," "helping [him] get a phone call," and more. PSAF ¶ 12. During his initial medical screening, at every opportunity, he requested "[his] medication, sanitary conditions . . . , a way for [him] to clean [his] eyes, a shower . . . , fresh clothes, toilet paper." PSAF ¶ 13. Once he was in the medical unit, he asked for two kinds of eyedrops, Advil, and a riboflavin vitamin, PSAF ¶ 14, all of which are available over the counter, PSAF ¶ 15, and he asked for "[sanitizing] wipes, ideally, access to a shower each day, soap, a new washcloth, new clothes, a cell that wasn't covered in vomit and feces, [and] if nothing else, some cleaning supplies." PSAF ¶ 16.

Over the remaining two weeks of his detention, he requested these things "many, many, many times." PSAF ¶ 17. In particular, he needed help using the phone kiosk system. PSAF ¶ 18. Because of his condition, Mr. Lewis could never be sure exactly to whom he was speaking, but he "expressed [himself] to whomever [he] thought to be in some administrative and/or authoritative capacity . . . . Anyone that seemed to be official that would be able to help [him], [he] tried to get help [from]," PSAF ¶ 19, and he did so "any chance [he] got." PSAF ¶ 20. When it came to his medicine, he "did [his] best to make [his] needs known to anyone that was able to hear [him]." PSAF ¶ 21. He asked other inmates, PSAF ¶ 22, the guards,

PSAF ¶ 23, and the nurses and doctor.[3] PSAF ¶ 24.

During intake, the responses he got were mostly "indifference" and "excuses." PSAF ¶ 26. He didn't get a copy of the inmate handbook or help registering for the phone system until a few hours before his release into house arrest. PSAF ¶ 27. He wasn't even aware of the inmate handbook's existence until his cellmate arrived in the medical unit and mentioned it to him. PSAF ¶ 28. No one ever explained to him the grievance process or any other process for requesting accommodations or asserting his rights. PSAF ¶ 29 ("I had zero clue.").

When he moved into the medical unit, his cell reeked of feces. PSAF ¶ 30. He got his allergy medicine, Advil, and some usable eyedrops—but not the ones he asked for. PSAF ¶ 31. When he asked why not, he was either ignored or patronized. PSAF ¶ 32 ("Okay, Mr. Lewis."). On or around August 6, he got a cellmate with a stomach virus of some sort. PSAF ¶ 33. His cellmate was "very sick. Shortly thereafter [Mr. Lewis] became very sick, both of [them] are running a high fever, [and] there's feces all over the floor." PSAF ¶ 34. Without any toilet paper, his cellmate "began using his clothes because his stomach was that messed up." PSAF ¶ 35. Moreover, eye infections were giving Mr. Lewis vertigo, and he eventually

---

[3] Mr. Lewis notes, though, that no one in the medical unit ever identified themselves specifically as an employee of Defendant's private medical contractor. PSAF ¶ 25.

became so nauseous he couldn't keep any food down. PSAF ¶ 36. At intake, he got a bag with "a pair of boxers and . . . a wash cloth," PSAF ¶ 37, but it took "ten days of begging" for him to get "an extra undershirt to use as a towel," "a bar of soap," or even "one roll of toilet tissue." PSAF ¶ 38.[4] Most of the time, he was told "just, 'Sit down,'" or given a snide comment about how gross his cell was. PSAF ¶ 40 ("Is that your [feces] all over the place?"). By the time of his release, Mr. Lewis had lost about twenty-five pounds. PSAF ¶ 41.

<em>Fulton County Jail's ADA Policies and Practices</em>

Defendant agrees: Its ADA policy[5] "needs to be updated." PSAF ¶ 42. The policy states it is reviewed annually, PSAF ¶ 47, but it has an effective date of January 1, 2002—more than twenty years ago today, and six years before the passage of the ADA Amendments Act of 2008. PSAF ¶ 48. Defendant agrees that its failure

---

[4] The woman who brought him these items did not identify herself, but Mr. Lewis believes from the jangling of her keys that she was a correctional officer. PSAF ¶ 39.

[5] In addition to the "ADA policy," Defendant maintains three other policies which briefly touch on disabled inmates or disability accommodations at the Jail. One applies only to staff and visitors—not inmates or detainees—and merely states Defendant's intent to meet its ADA duty to these people. PSAF ¶ 43. The second only provides for things like handrails in visitation areas. PSAF ¶ 44. And the third, in relevant part, states as if it is fact that services at the Jail "are accessible to impaired inmates in the same manner as non-impaired inmates" and requires inmates to submit accommodation requests in writing. PSAF ¶ 45. None of these policies in any way references vision-related disabilities. PSAF ¶ 46.

to update its ADA policy for so long can only be the result of deliberate choice. PSAF ¶ 76. Indeed, some of the language in the ADA policy is so antiquated, PSAF ¶ 49, that Defendant's own Accreditation Manager testified that she was "shocked" to think it is was reviewed annually. PSAF ¶ 50. If it is, the "Program Coordinator" responsible for administering the policy is not involved in that review. PSAF ¶ 51. Defendant does not keep a designated ADA coordinator on staff. PSAF ¶ 52.

As pertains to inmates with vision impairments, Defendant's ADA policy directs inmates to contact the Program Coordinator for assistance with reading, PSAF ¶ 53, stating:

> If a disabled inmate, as defined by A.D.A. wishes to grieve an issue, staff will fully assist the inmate in understanding the grievance process and in completing the process. This is especially true if the inmate requires assistance in writing or if the inmate is mentally ill or developmentally disabled.

PSAF ¶ 54. This snippet is Defendant's only official policy statement regarding any kind of process for addressing inmates' requests for disability accommodations. PSAF ¶ 55. However, it bears mention that Defendant's ADA and ADA-adjacent policies do not anywhere identify accommodation requests as proper subjects for grievances or state that such requests should be handled through the usual grievance process. PSAF ¶ 56.

Defendant's inmate handbook offers similarly little guidance, PSAF ¶ 57, and

it is only available in visual formats. PSAF ¶ 58. Defendant does not provide its employees any specific training to ensure they uphold their duties under the ADA, or even their obligations under the above, official statements of Jail policy. PSAF ¶ 59. Defendant acknowledges that inmates who cannot see must get assistance with submitting a request for accommodations, PSAF ¶ 60, but an inmate's disability is not documented anywhere outside his medical file, nor are an inmate's requests for disability accommodations or the approval or denial thereof. PSAF ¶ 61. Jail staff thus have no way of knowing which inmates need accommodations, which need help requesting accommodations, or even when an inmate has been approved for a non-medical accommodation, such as reading services or voluntary readers. *Id.* Defendant agrees, in principle, that this information "should" be documented. PSAF ¶ 62. Defendant agrees that there "should" be a mechanism for ensuring that Jail staff are responsive and respectful of inmates with disabilities, but Defendant is not aware of any such mechanism. PSAF ¶ 63.

When asked what efforts it makes to self-monitor ADA compliance, Defendant was unable to provide a cohesive answer. Rather, Defendant's "process" for identifying and addressing accommodation requests is little more than a free-for-all. At times, Defendant has said it utilizes "logbooks" for recording inmates' disabilities and needs for accommodations, PSAF ¶ 64, but Defendant also has

admitted this "logbook" approach is unreliable and haphazard. PSAF ¶ 65 ("Anything we do, we usually log it in. But a lot of times we're so busy . . . . We just continuously help, make sure the inmate is okay, and move on."). Other times, accommodation requests must go through the regular request/grievance process. PSAF ¶ 66. But where a request for disability accommodations involves sanitation issues, environmental maintenance, or medical care, the accommodation request must go through one of those three channels, all of which are unique. PSAF ¶ 67. Most of the time, resolution of an accommodation request (if it is resolved) will come from a Jail official who reports ultimately to the Sheriff, PSAF ¶ 68, but when a request implicates a "clinical decision," Defendant's medical contractor may sometimes "trump whatever custody thinks." PSAF ¶ 69.

## II.    Argument and Citation to Authority

Mr. Lewis asserts four claims against Defendant, in his official capacity only. Two claims arise, together, under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("Rehab Act"). Doc. 19 at ¶¶ 86-104. The other two arise under the Fourteenth Amendment, via 42 U.S.C. § 1983 ("Section 1983"), for Defendant's failure to provide him adequate medical care and denial of his due-process rights. *Id.* at ¶¶ 107, 108.

The remainder of this brief will show: (A) the record contains significant

evidence supporting Mr. Lewis' claims under the ADA and Rehab Act, precluding summary judgment on the substance of those claims; (B) Defendant's misconduct also violated Mr. Lewis' constitutional rights, and so Defendant is not entitled to summary judgment on Mr. Lewis' claims under Section 1983, nor sovereign immunity to his claims under the ADA and Rehab Act; (C) Defendant's misconduct was the result of deliberate indifference in the Sheriff's policymaking activity, and so Defendant is liable to Mr. Lewis for compensatory damages; and (D) Mr. Lewis is entitled to injunctive relief.

### A. Defendant discriminated against Mr. Lewis in violation of Title II of the ADA and of the Rehab Act.

To state a prima facie case of discrimination under Title II of the ADA, a plaintiff must show: "(1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132). Defendant agrees that this is the correct standard of liability and that liability under the Rehab Act requires an identical analysis (with the additional requirement that the public entity receive federal funding). Doc. 76-1 at 7. Defendant also admits to receiving federal funding.

PSAF ¶ 70.

Moreover, the record contains abundant evidence, such as the medical records from Mr. Lewis' time in Defendant's custody, that Mr. Lewis is a "qualified individual with a disability" for the purposes of the ADA. *See, e.g.*, PSAF ¶¶ 7, 8, 9. Defendant's motion does not challenge Mr. Lewis' status as such an individual. *See generally* Doc. 76-1. *See also* Doc. 71-1 at 8 (Defendant Wilcher admitting that Mr. Lewis is entitled to the ADA's protections).

Thus, for Defendant to prevail on its motion for summary judgment, Defendant must show, granting Mr. Lewis the benefit of every genuine factual dispute, that no reasonable jury could find he was "excluded from participation in or . . . denied the benefits of the services, programs, or activities of [Defendant], or . . . subjected to discrimination by [Defendant]." 42 U.S.C.A. § 12132 (emphasis added). At this endeavor, Defendant cannot succeed. Its policies are inherently discriminatory against individuals with vision-related disabilities, as Mr. Lewis' experience demonstrates.

### 1. Defendant's policies facially discriminate against individuals with vision-related disabilities.

The inmate handbook contains critical information inmates need to enforce their rights, PSAF ¶ 71, but Defendant does not offer the inmate handbook in

anything but a visual format. PSAF ¶ 58. Moreover, Defendant's <u>only</u> official policy that expressly discusses inmates' requests for disability accommodations requires such requests to be put in writing. PSAF ¶¶ 45, 55.

By reason of his disability, Mr. Lewis cannot read or write, and so a reasonable jury could certainly conclude that Defendant's policies, on their face, "excluded [him] from participation in or . . . denied the benefits of the services, programs, or activities of [Defendant], or . . . subjected to discrimination by [Defendant]" in violation of 42 U.S.C.A. § 12132.

> **2. Defendant denied Mr. Lewis equal access to its services and programs, failed in its duty to provide him reasonable accommodations, and otherwise discriminated against him.**

In addition to being facially discriminatory, Defendant's anti-discrimination policies, in function, do not address the needs of inmates with vision impairments.

A public entity's duties under the ADA go beyond a mere passive responsibility not to discriminate as a matter of official policy. The ADA also charges entities such as Defendant with the affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072,

1081–82 (11th Cir. 2007) (quoting 28 C.F.R. § 35.130(b)(7)). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *Id.* at 1082 (quoting 28 C.F.R. § 35.160(b)(2)).

Here, because of his disability, Mr. Lewis needed and requested various accommodations in the form of reading assistance, writing assistance, personal hygiene, navigation, and medical care. PSAF ¶¶ 12-16. Mr. Lewis only learned of the inmate handbook from another inmate, PSAF ¶ 28, and Defendant never gave Mr. Lewis a copy until his release into house arrest. PSAF ¶ 27. Defendant never gave Mr. Lewis assistance with using the phone until his release. *Id.* Defendant required Mr. Lewis to sign multiple documents but sometimes did not inform Mr. Lewis of the documents' content, despite his requests. PSAF ¶¶ 72, 73.

Even in the medical unit, Mr. Lewis struggled at first to get anyone to acknowledge his disability. PSAF ¶ 5. Eventually, he got his allergy medicine, Advil, and some usable eyedrops—but not the ones he asked for. PSAF ¶ 31. When he asked why not, he was either ignored or patronized. PSAF ¶ 32 ("Okay, Mr. Lewis."). Despite his extraordinary need for sanitary conditions, PSAF ¶ 2, it took "ten days of begging" for him to get "an extra undershirt to use as a towel," "a bar of soap," or even "one roll of toilet tissue." PSAF ¶ 38.

He was so desperate for help that he asked every time he heard someone pass by his cell, PSAF ¶¶ 17-25, but his numerous requests were never documented, PSAF ¶¶ 7-11, because Defendant never gave him any assistance filing a request or grievance of any kind. PSAF ¶¶ 26, 29 ("I had zero clue"), 40, 60.

In its motion, Defendant recites the text of its policies, some favorable testimony about what should have happened, and the fact that Mr. Lewis spent most of his time in custody on the medical unit—but nothing else. Doc. 76-1 at 8-10. Defendant presents no evidence that Jail staff followed the policies, that they even knew what their responsibilities were, or any other evidence refuting Mr. Lewis' account of his actual experience while at the Jail.

That is, on top of the facially discriminatory policies discussed above, the record here contains abundant evidence, much of which is indisputable, from which a reasonable jury could conclude that Defendant failed to accommodate Mr. Lewis' disability and otherwise "excluded [him] from participation in [and] denied [him] the benefits of [its] services, programs, or activities." 42 U.S.C.A. § 12132. The other elements of Defendant's liability under the ADA and Rehab Act are also admitted or undisputed, *see* pp. 9-10, *supra*, and Defendant's only argument to the contrary is little more than a recitation of some disputed, hypothetical, and barely relevant evidence. Defendant is not entitled to judgment as a matter of law on the

substance of these claims, and its motion should therefore be denied.

### B. Defendant's acts and omissions violated Mr. Lewis' constitutional rights.

With the ADA, Congress abrogated sovereign immunity for "conduct that violates both Title II and the Fourteenth Amendment." *Black v. Wigington*, 811 F.3d 1259, 1269 (11th Cir. 2016) (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)). Like Mr. Lewis' rights under Title II discussed above, Defendant's conduct here also violated Mr. Lewis' constitutional rights of access to the courts and to adequate medical care, and so Defendant is liable to Mr. Lewis under Section 1983 and enjoys no immunity to his ADA claims.[6]

#### 1. Defendant's discrimination violated Mr. Lewis' constitutional right of access to the courts.[7]

Under the Fourteenth Amendment, "prisoners have a constitutional right of

---

[6] "Under the Rehabilitation Act, a state waives its sovereign immunity if it receives federal financial assistance." *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 774 (11th Cir. 2020) (citing *Garrett v. Univ. of Ala. Birmingham Bd. of Trs.*, 344 F.3d 1288, 1290–91 (11th Cir. 2003) (per curiam); 42 U.S.C. § 2000d-7). Defendant admits to receiving federal funds, PSAF ¶ 72, and is therefore not entitled to sovereign immunity for Mr. Lewis' claims under the Rehab Act.

[7] It bears mention that Defendant's discrimination likely caused Mr. Lewis other due-process injuries, for example, by making him sign paperwork without informing him of the contents, but because Mr. Lewis' criminal charges were eventually dismissed for prosecutorial misconduct, these other injuries will not be discussed here.

access to the courts," *Bounds v. Smith*, 430 U.S. 817 at 821 (1977), which "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers." *Id.* at 828. More to the point, this right of access to the courts is the paradigmatic example of where Title II of the ADA abrogates sovereign immunity. *See Tennessee v. Lane*, 541 U.S. 509, 523 (2004) ("These rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment."); *id.* at 531 ("Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services.").

Claims of this nature mostly turn on the question of standing and whether the denial of access constitutes an "actual injury." *See generally Lewis v. Casey*, 518 U.S. 343 (1996). The denial of access itself is typically not enough to state a *Bounds* claim. *See, e.g.*, *Smith v. United States*, 386 F. App'x 853, 855 (11th Cir. 2010) ("Unlike the plaintiffs in *Casey* and *Barbour*, Smith is not bringing a freestanding access-to-the-court claim in the hopes of obtaining judicial review of actions undertaken by the political branches of government." (discussing *Casey*, *supra*, and *Barbour v. Haley*, 471 F.3d 1222 (11th Cir. 2006)). Instead, a *Bounds* violation occurs where the defendant's actions "have impeded the inmate's pursuit of a nonfrivolous, post-conviction claim or civil rights action." *Wilson v. Blankenship*,

163 F.3d 1284, 1290 (11th Cir. 1998). *See also Casey*, 518 U.S. at 355 ("The tools [*Bounds*] requires to be provided are those that the inmates need . . . in order to challenge the conditions of their confinement."); *Bass v. Singletary*, 143 F.3d 1442, 1445 (11th Cir. 1998) ("[T]he prison officials' actions which allegedly infringed an inmate's right of access to the courts must have frustrated or impeded the inmate's efforts to pursue a nonfrivolous legal claim." (citing *Casey*, 518 U.S. at 352–54)).

Here, of course, Mr. Lewis does not present a freestanding claim for denial of access to the courts. However, Defendant's utter failure to document his many requests for disability accommodations and utter failure to assist him with filing these requests and other grievances, discussed in more detail in section II.A *supra*, have clearly "frustrated or impeded [his] efforts to pursue" the other claims he asserts. *Bass*, 143 F.3d at 1445. Indeed, Defendant specifically cites these failures as supposed evidence of its innocence, Doc. 76-1 at 11, and Sheriff Wilcher, in his own motion, argues that the absence of these grievances means Mr. Lewis did not exhaust his administrative remedies and so the Court lacks jurisdiction to hear his claims. Doc. 71-1 at 22-23 (citing 42 U.S.C. § 1997e(a)).[8] Defendant does not, however,

---

[8] It is an open question in the Eleventh Circuit whether a prisoner suing over jail conditions after his release is subject to the administrative-exhaustion requirement in 42 U.S.C. § 1997e(a). A decision from 2000, *Harris v. Garner*, 216 F.3d 970, is often cited for the proposition, but it does not actually so hold.

offer any excuse for denying this blind inmate his grievance rights and failing "to assist [him] in the preparation and filing of meaningful legal papers." *Bounds*, 430 U.S. at 828.

Mr. Lewis therefore submits that his case presents, at a minimum, a factual dispute precluding summary judgment on the question of whether Defendant illegally restricted Mr. Lewis' access to the courts.

### 2. Defendant showed deliberate indifference to Mr. Lewis's serious medical needs, thereby violating his constitutional rights.[9]

"To prevail on a claim of deliberate indifference to serious medical need in violation of the Fourteenth Amendment, a plaintiff must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Gilmore v. Hodges*, 738 F.3d 266, 273–74 (11th Cir. 2013) (quoting *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th

---

[9] This is the first of two "deliberate indifference" inquiries Mr. Lewis' claims involve, but although they are similar in name, they are meaningfully distinct. *See, e.g.*, *Goebert v. Lee Cnty.*, 510 F.3d 1312 (11th Cir. 2007) (engaging in two separate deliberate-indifference inquiries and applying different standards in each). In this section, Mr. Lewis discusses the indifference Jail <u>staff</u> showed to his serious medical needs. As agents of Defendant, even if they are not personally liable to Mr. Lewis, their violations of his constitutional rights are still relevant to the question of Defendant's sovereign immunity to his ADA claims. The next section, II.C, discusses the <u>Sheriff's</u> indifference, in a supervisory capacity, to the obvious risk of these constitutional and statutory injuries, which determines Defendant's liability for compensatory damages.

Cir. 2010)). Defendant's motion does not challenge the objective element here, Mr. Lewis' serious medical need; Defendant only challenges the second (and, implicitly) third elements of his prima facie case, the subjective elements involving deliberate indifference. Doc. 71-1 at 11-14.

"Deliberate indifference to serious medical needs may be shown by failure to provide prompt attention to those needs by delaying necessary medical treatment for nonmedical reasons <u>or</u> by proving a policy of deficiencies in staffing or procedures such that the [pretrial detainee] is effectively denied access to adequate medical care." *Thomas v. Town of Davie*, 847 F.2d 771, 772–73 (11th Cir. 1988) (string cite omitted) (emphasis added).[10] To satisfy this element of deliberate indifference, Mr. Lewis "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)) (alteration in original). For example, the Eleventh Circuit has "long held that deprivation of needed eyeglasses or prosthetic devices stated [a deliberate indifference claim] because the unavailability

---

[10] This section of the brief focuses on Defendant's "failure to provide prompt attention" to Mr. Lewis' serious medical needs, but see II.C, *infra*, for a discussion of the evidence that the harm Mr. Lewis suffered was also the result of "a policy of deficiencies in staffing [and] procedures." *Town of Davie*, 847 F.2d 771.

of eyeglasses or prostheses may lead to 'severe harm.'" *Gilmore*, 738 F.3d at 274-75 (quoting *Newman v. Alabama*, 503 F.2d 1320, 1331 (5th Cir. 1974))); *see also Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) ("[A]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." (quoting *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997))); *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) ("[A] defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994))); *id.* ("A complete <u>denial of readily available treatment for a serious medical condition constitutes deliberate indifference</u>." (citing *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994)) (emphasis added)).

Such is exactly the case here. Defendant's medical contractor (eventually) documented Mr. Lewis' ectasia, PSAF ¶¶ 7-9, and for the two weeks he was in the medical unit, he was so desperate for help that he asked every time he heard someone pass by his cell, including both guards and medical staff. PSAF ¶¶ 17-25. There can be no question Defendant was aware of his extraordinary need for sanitary conditions, PSAF ¶ 2, and aware of the squalor he was living in, PSAF ¶¶ 34, 35, 40, and yet it still took him "ten days of begging" just to get "an extra undershirt to

use as a towel," "a bar of soap," or even "one roll of toilet tissue." PSAF ¶ 38. In the

two weeks he was in the medical unit, he never got his prescription eyedrops, PSAF

¶ 31, even though they're available over the counter. PSAF ¶ 15.

Clearly, Mr. Lewis was not asking for anything outrageous, nor were Jail staff

unavailable to help or unaware of his needs and requests—they are always present

in the medical unit. PSAF ¶ 74. Rather, the record shows that, like the plaintiff in

*Harris*, Mr. Lewis was simply denied "readily available treatment." *Bingham*, 654

F.3d at 1176 (discussing *Harris*, 21 F.3d at 393 (11th Cir. 1994). Like in *Hill*,

Defendant here had ample, actual knowledge of Mr. Lewis' serious medical need,

but delayed, failed to provide, and often simply refused to acknowledge Mr. Lewis'

requests for basic hygienic amenities. *Lancaster*, 116 F.3d at 1425 (discussing *Hill*,

40 F.3d 1176).

In short, the evidence here is more than enough for a reasonable jury to

conclude that Defendant showed deliberate indifference to Mr. Lewis' admittedly

serious medical needs. For this reason and, independently, because of Defendant's

*Bounds* violations discussed above, the Court should deny Defendant's motion as to

Mr. Lewis' claims under Section 1983 and as to Defendant's assertion of sovereign

immunity to his claims under the ADA.

**C. Mr. Lewis' injuries were the result of Defendant's deliberate indifference to its duties under the ADA and Rehab Act, and so Defendant is liable to Mr. Lewis for compensatory damages.**

For claims against a public entity under the ADA and Rehab Act, compensatory damages are appropriate where the defendant's misconduct amounts to deliberate indifference by "someone whose actions can fairly be said to represent the actions of the organization." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012)) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). Within the Fulton County Sheriff's Office, the Sheriff is clearly such an individual, and Defendant does not challenge his status as such. Defendant is thus liable to Mr. Lewis for compensatory damages if Mr. Lewis' injuries are the result of deliberate indifference by the Sheriff.

Deliberate indifference in this supervisory capacity occurs when "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *T.W. ex rel. Wilson v. Sch. Bd. Of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 1992). However, actual knowledge is not required. Deliberate indifference here is a "'rough parallel' to [a] notice-and-opportunity requirement[]." *Liese*, 701 F.3d at 348 (quoting *Gebser*, 524 U.S. at 290). S*ee also Goebert*, 510 F.3d at 1331-32 ("[A] plaintiff must show that the defendant instituted a custom or policy that <u>results</u> in deliberate indifference to

constitutional rights . . . ." (emphasis added) (internal citations, quotations, and alterations omitted)).

Here, the record is rife with evidence of the Sheriff's deliberate indifference as a policymaker. For example, the Sheriff is the final decisionmaker for all changes to Defendant's ADA policy, PSAF ¶ 75, and the ADA policy states that it shall be reviewed annually. PSAF ¶ 47. However, if that annual review has been happening, it has been without any input from Defendant's Program Coordinator, the very official charged with administering the ADA policy. PSAF ¶ 51. And whether or not that annual review has been happening, the policy has not in fact been updated in over twenty years. PSAF ¶ 58. Indeed, it has not been updated since six years before the passage of the sweeping ADA Amendments Act in 2008. *Id.* These indisputable facts demonstrate not just indifference but utter disregard by Defendant for its duties under federal anti-discrimination law.

Moreover, some of the terminology in the ADA policy is so grossly out of touch that Defendant's own Accreditation Manager finds it hard to believe the annual review truly happens. PSAF ¶ 50 ("I'm shocked"). She agrees the ADA policy and all others that touch on disabilities and accommodations "need[] to be updated," PSAF ¶ 42, and in particular she agrees that the risk of inmates like Mr. Lewis suffering harm like he suffered is so obvious that Defendant's failure to

maintain its policies can only be the result of deliberate choice. PSAF ¶ 76.

These egregious policymaking failures are borne out in Defendant's practical failures to train its staff on their duties under the ADA and official Jail policies, PSAF ¶ 59, to maintain any semblance of a functional accommodation request process, *see* II.A.2, *supra*, and to alert Jail staff in any way to which inmates may require assistance or may be approved for certain accommodations such as reading services. PSAF ¶¶ 61, 62. These failures are also easily preventable, *see, e.g.*, *Bircoll*, 480 F.3d at 1088 (affirming summary judgment for public entity that maintained a practice of "affix[ing] an ADA stamp to [the] jail card" of inmates with disabilities), and their prevention is exactly why ADA coordinators exist. Defendant, however, has opted not to employ an ADA coordinator. PSAF ¶ 52.

These failures and more, for all the reasons discussed in detail above, directly caused the violations of Mr. Lewis' statutory rights and, as set forth above, "result[ed] in deliberate indifference to [his] constitutional rights." *Goebert*, 510 F.3d at 1331-32. That is, the record evidence in this case is more than enough for a reasonable jury to conclude that Mr. Lewis' injuries were the result of deliberate indifference in Defendant's policymaking, for which Defendant is therefore liable to Mr. Lewis for compensatory damages.

**D. Mr. Lewis is entitled to injunctive relief.**

Finally, even if the Court finds that Defendant has proven as a matter of law that it is not liable to Mr. Lewis for compensatory damages and/or that it did not violate Mr. Lewis' constitutional rights, his claims for injunctive relief remain, under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). *See, e.g.*, *Schultz v. Alabama*, 42 F.4th 1298, 1314 (11th Cir. 2022).

Here, Mr. Lewis makes several modest requests for injunctive relief, seeking an order that Defendant, for example, begin offering the inmate handbook in audio format, implement a policy that alerts Jail staff to which inmates are entitled to the ADA's rights and protections (such as in *Bircoll*, *supra*), train its employees on their duties to inmates with vision impairments under Defendant's existing policies, and modify its ADA policies and accommodation-request processes so that they are not utterly dysfunctional.

Defendant does not challenge Mr. Lewis' standing for injunctive relief. *See generally* Doc. 76-1.

**III.  Conclusion**

In summary, the record here provides significant support for Mr. Lewis' prima facie cases for disability discrimination both as a matter of Defendant's official policies and in his experience of Defendant's actual practices. In particular,

Defendant's egregious indifference to his grievance rights and serious medical needs deprived Mr. Lewis of due process in multiple ways, and so Defendant enjoys no immunity here. Rather, the record evidence firmly establishes Defendant's liability to Mr. Lewis for damages and injunctive relief, under the ADA, Rehab Act, and Section 1983. Defendant's motion should therefore be denied in its entirety.

Respectfully submitted this April 4, 2023.

**Jake Knanishu**
Georgia Bar No. 597103
James Radford
Georgia Bar No. 108007
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
T: (678) 271-0300
F: (678) 271-0311
jake@decaturlegal.com
james@decaturlegal.com

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on April 4, 2023, I filed the foregoing document through the Court's CM/ECF system, which will send email notification of such filing to all attorneys of record in this matter.

**<u>Jake Knanishu</u>**
Georgia Bar No. 597103